# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| BASEL MUSHARBASH, | |
| | |
| Plaintiff, | |
| | |
| v. | Case No. _____ |
| | |
| U.S. ANESTHESIA PARTNERS, INC., WELSH, CARSON, ANDERSON & STOWE XI, L.P., WCAS ASSOCIATES XI, LLC, WELSH, CARSON, ANDERSON & STOWE XII, L.P., WCAS ASSOCIATES XII, LLC, WCAS MANAGEMENT CORPORATION, WCAS MANAGEMENT, L.P., and WCAS MANAGEMENT, LLC, | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |
| | |
| Defendants. | |

i

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................1

JURISDICTION AND VENUE ......................................................................4

THE PARTIES ...............................................................................................5

    A. Plaintiff ...............................................................................................5

    B. Defendant USAP .................................................................................5

    C. Defendant Welsh Carson ....................................................................5

FACTUAL ALLEGATIONS ...........................................................................9

I.   USAP'S ANTICOMPETITIVE SERIAL ACQUISITION SCHEME................9

    A. Welsh Carson Conspires with Healthcare Executives to Monopolize
       Anesthesia Markets................................................................................9

    B. Defendants Begin Rolling up Houston with the Acquisition of Greater
       Houston Anesthesiology ......................................................................10

    C. Defendants Continue their Consolidation Strategy by Acquiring Twelve
       Additional Anesthesia Practices in Houston, Dallas-Fort Worth and Austin 13

       1.  USAP Acquires Lake Travis Anesthesiology ...........................17

       2.  USAP Acquires North Houston Anesthesiology-Kingwood Division......17

       3.  USAP Acquires Pinnacle Anesthesia Consultants....................18

       4.  USAP Acquires Anesthesia Consultants of Dallas...................20

       5.  USAP Acquires Excel Anesthesia Consultants ........................21

       6.  USAP Acquires Southwest Anesthesia Associates...................22

       7.  USAP Acquires BMW Anesthesiology ...................................22

       8.  USAP Acquires Medical City Physicians.................................22

       9.  USAP Acquires Sundance Anesthesia.....................................23

       10.USAP Acquires MetroWest Anesthesia Care ..........................23

       11.USAP Acquires Capitol Anesthesiology Association ...............24

       12.USAP Acquires Guardian Anesthesia Services........................25

    D. Defendants Acquire Three Practices in Tyler, Amarillo, and San Antonio to
       Preserve Monopoly and Pricing Power in Houston, Dallas, and Austin.......25

       1.  USAP Acquires East Texas Anesthesiology Associates...........25

2. USAP Acquires Amarillo Anesthesia Consultants ...................................26

3. USAP Acquires Star Anesthesia ................................................................26

II. THE RELEVANT MARKETS .................................................................................27

A. Hospital-Only Anesthesia Services Sold to Patients with Commercial
Insurance and Uninsured Patients.................................................................27

B. The Geographic Markets: the Houston, Dallas-Fort Worth, and Austin MSAs
33

1. The Houston MSA....................................................................................33

2. The Dallas-Fort Worth MSA ...................................................................35

3. The Austin MSA.......................................................................................37

4. Additional Evidence Confirming the Houston, Dallas-Fort Worth, and
Austin MSAs are Relevant Geographic Markets .....................................38

III. STATUTE OF LIMITATIONS ...............................................................................41

A. Fraudulent Concealment...............................................................................41

B. Suspension of Limitations ............................................................................43

IV. WELSH CARSON CONSPIRED TO MONOPOLIZE THE HOUSTON,
DALLAS-FORT WORTH, AND AUSTIN MSAS .......................................44

A. Phase 1: Welsh Carson and John Rizzo Hatch the Conspiracy to Monopolize
the Relevant Markets .....................................................................................44

B. Phase 2: Welsh Carson Directs and Profits from the Conspiracy to
Monopolize the Relevant Markets.................................................................45

V. MONOPOLY POWER ............................................................................................48

A. USAP Leverages Its Monopoly Power to Charge Monopoly Prices ...........48

B. Market Share and Concentration Data Demonstrate USAP's Monopoly
Power ..............................................................................................................50

1. Houston MSA ...........................................................................................50

2. Dallas-Fort Worth MSA ..........................................................................52

3. Austin MSA ..............................................................................................54

C. USAP's Monopoly Power Is Durable and Resistant to Competition............58

D. The Monopolization Scheme Lowered the Quality of Anesthesia Services in
the Relevant Markets .....................................................................................59

E. Defendants' Scheme Did Not Create Efficiencies That Benefited Patients..61

F. Defendants' Violation of the Antitrust Laws Has Had a Continuing Impact 62

VI.   USAP ALSO AGREED TO FIX PRICES WITH AT LEAST THREE
      GROUPS..................................................................................................63

A. USAP's Agreement with Methodist Hospital Physician Organization..........64

B. USAP's Agreement with Dallas Anesthesiology Associates........................65

C. USAP's Agreement with Baylor College of Medicine...................................67

D. USAP's Attempted Agreement with a University of Texas Group...............68

VII.   THE FEDERAL TRADE COMMISSION FILES SUIT. ............................69

VIII.  EMPLOYEE BENEFIT PLANS FILE SUIT ..............................................69

IX.    USAP ALSO AGREED TO ALLOCATE A MARKET................................70

CLASS ACTION ALLEGATIONS ........................................................................70

A. Numerosity (Rule 23(a)(1))........................................................................71

B. Commonality (Rule 23(a)(2))......................................................................71

C. Typicality (Rule 23(a)(3))...........................................................................72

D. Adequacy (Rule 23(a)(4) and 23(g)) ........................................................73

E. Rule 23(b)(2) .............................................................................................73

F. Rule 23(b)(3) .............................................................................................73

VIOLATIONS .......................................................................................................74

COUNT ONE........................................................................................................74

COUNT TWO........................................................................................................75

COUNT THREE ...................................................................................................76

COUNT FOUR......................................................................................................77

COUNT FIVE .......................................................................................................79

COUNT SIX..........................................................................................................80

PRAYER FOR RELIEF ........................................................................................82

DEMAND FOR JURY TRIAL ...............................................................................83

Plaintiff Basel Musharbash, based on his own knowledge and personal belief, the investigation of his counsel and the Federal Trade Commission's September 21, 2023, Complaint ("FTC Complaint"), brings this complaint on behalf of himself and a proposed Class under Section Seven of the Clayton Act, 15 U.S.C. § 18, and Sections One and Two of the Sherman Act, 15 U.S.C. §§ 1, 2, and alleges as follows:

## INTRODUCTION

1.     For over a decade, Defendants U.S. Anesthesia Partners, Inc. ("USAP") and Welsh Carson[1] engaged in a scheme to monopolize hospital anesthesia services in Texas, drive up prices, and increase their profits. Defendants successfully executed this monopolization scheme by acquiring thirteen anesthesia practices across Houston, Dallas-Fort Worth, and Austin. As a result of these acquisitions, USAP excluded competition in those markets, allowing it to profitably increase prices. This lawsuit challenges USAP and Welsh Carson's anticompetitive conduct.

2.     Welsh Carson is a multi-billion-dollar private equity firm based in New York. In 2012, Welsh Carson, together with a group of healthcare executives,

---

[1] Welsh Carson refers collectively to Welsh, Carson, Anderson & Stowe XI, L.P.; WCAS Associates XI, LLC; Welsh, Carson, Anderson & Stowe XII, L.P.; WCAS Associates XII, LLC; WCAS Management Corporation; WCAS Management, L.P.; and WCAS Management, LLC.

hatched an "anesthesiology consolidation strategy," or "roll-up strategy." The plan was to "build a platform" by "consolidating practices with high market share in a few key markets," with the goal of raising prices through increased "[n]egotiating leverage with" payors. That new company would become USAP.

3.    USAP, formerly New Day Anesthesia, is a physician services organization formed in 2012 by Welsh Carson and two healthcare executives, John Rizzo and Kristen Bratberg. Rizzo and Bratberg, along with Welsh Carson partners, Brian Regan and D. Scott Mackesy, founded USAP to execute the anesthesia roll-up strategy in Houston, Dallas-Fort Worth, and Austin.

4.    USAP "partners" with—a euphemism for acquires—anesthesia providers. From its conception, USAP was to pursue an "aggressive 'buy and build' consolidation strategy." USAP aimed to consolidate dominant market share by acquiring competitors. It would then use its negotiating leverage to raise the price of anesthesia services.

5.    Defendants pitched USAP to doctor groups as a more efficient anesthesiology firm with money to invest in quality. In reality, USAP's strategy has diminished the quality of anesthesiology services, while also increasing prices.

6.    USAP, together with Welsh Carson and its co-conspirators, successfully executed that plan. By January 2020, USAP acquired sixteen anesthesia groups, including the dominant providers in Houston, Dallas-Fort

Worth, and Austin. As a result, by 2021, USAP had nearly 70% market share of the Houston Metropolitan Statistical Area ("MSA"), 68% of the Dallas-Fort Worth MSA, and greater than 50% of the Austin MSA, by revenue. USAP faces minimal, if any, competition.

7.    USAP's dominance in the Houston, Dallas-Fort Worth, and Austin MSAs gives it enormous bargaining power over insurers. If an insurer defies USAP's pricing demands, the majority of anesthesiologists in Houston, Dallas-Fort Worth, and Austin would be out-of-network. An executive at the largest health insurer in Texas explained that "every time [USAP] folded in a geographic region or every time that they grew, it just strengthened their ability to raise rates and . . . leverage at the negotiating table."

8.    USAP exploited its leverage to raise prices. Upon each acquisition, USAP raised prices to its higher reimbursement rate and continued to increase prices. These price increases were not accompanied by quality improvements. By 2020, USAP's reimbursement rates are "nearly 40% more expensive than the average cost of all other anesthesia providers in Texas" and far exceed the average in-network rate in each of the relevant MSAs.

9.    When it could not acquire a competitor, USAP fixed prices with the would-be rival. USAP entered into price-fixing agreements with at least three anesthesia groups, the Methodist Hospital Physician Organization, Dallas

3

Anesthesiology Associates, and the anesthesiologist group associated with the Baylor College of Medicine. USAP also agreed to allocate the market with another physician group that provides anesthesiology services. These agreements enabled USAP to further increase prices.

10.    USAP's consolidation scheme and agreements with competitors caused Mr. Musharbash and other patients with commercial insurance plans, as well as uninsured individuals, to pay artificially inflated prices for hospital-only anesthesia services in Houston, Dallas-Fort Worth, and Austin. The Federal Trade Commission recently filed suit to enjoin USAP and Welsh Carson's conduct, and employee benefit plans have filed a private suit against Defendants based on the same conduct. By bringing this action on behalf of himself and those similarly situated, Plaintiff seeks to vindicate his rights under the antitrust laws, restore competition for hospital-only anesthesiology services, and recover damages for overcharges.

## **<u>JURISDICTION AND VENUE</u>**

11.    This Court has subject matter jurisdiction over this action pursuant to Sections Four and Sixteen of the Clayton Act, 15 U.S.C. §§ 15, 26, and 28 U.S.C. §§ 1331, 1337.

12.    Venue is proper in this District under Section Twelve of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b).

4

13.     The Court has personal jurisdiction over each Defendant under Section Twelve of the Clayton Act, 15 U.S.C. § 22, and Federal Rule of Civil Procedure Four, and one or more Defendant may be found in this District.

## THE PARTIES

### A.     Plaintiff

14.     Plaintiff Basel Musharbash is a citizen of the State of Texas. During the Class Period, Mr. Musharbash paid USAP $637.10 for anesthesiology services provided at Medical City Dallas Hospital. Insurance paid the remaining $135.39 that he was billed.

### B.     Defendant USAP

15.     Defendant U.S. Anesthesia Partners, Inc. is a for-profit Delaware corporation. Its principal place of business is 12222 Merit Drive, Suite 700, Dallas, Texas 75251. USAP has over 4,500 anesthesia providers across Colorado,[2] Florida, Indiana, Kansas, Kentucky, Maryland, Nevada, Oklahoma, Ohio, Tennessee, Texas, Washington, and Washington D.C.

### C.     Defendant Welsh Carson

---

[2] USAP Colorado recently agreed to make certain divestitures and pay monetary relief in connection with the Colorado Department of Law's investigation into USAP Colorado's anticompetitive business practices. *Private equity-run U.S. Anesthesia Partners to end Colorado health care monopoly under agreement with Attorney General Phil Weiser*, Colo. Att'y Gen. (Feb. 27, 2024), https://coag.gov/press-releases/usap-health-care-monopoly-attorney-general-phil-weiser-2-27-2024/.

16.     Defendant Welsh, Carson, Anderson & Stowe is a private equity firm headquartered at 599 Lexington Avenue, Suite 1800, New York, New York 10022. Welsh Carson co-founded USAP in 2012 and has controlled or directed and invested in USAP through five management organizations—Defendant WCAS Management Corporation; Defendant WCAS Associates XI, LLC; Defendant WCAS Associates XII, LLC; Defendant WCAS Management, L.P.; and Defendant WCAS Management, LLC—and two investment funds, Defendant Welsh, Carson, Anderson & Stowe XI, L.P. and Defendant Welsh, Carson, Anderson & Stowe XII, L.P. Welsh Carson partners control the various management entities by serving as officers or "managing members." The management entities, in turn, control the management funds.

17.     These eight Defendants (collectively referred to as "Welsh Carson") function as a single entity with a shared identity. They all share the trademarks "WCAS" and "Welsh, Carson, Anderson & Stowe," registered to Defendant WCAS Management Corp.; use the same principal place of business, 599 Lexington Avenue, Suite 1800, New York, New York 10022; and share corporate officers. Specifically, during the relevant period, D. Scott Mackesy, Welsh Carson's "Managing Partner of the Firm," was also a managing member of Defendants WCAS Associates XI and XII, LLC, President and a director of Defendant Welsh Carson Management Corp., and a managing member and

director of Welsh Carson Management, LLC.

18.     In 2012, Welsh Carson owned 50.2% of USAP. At all times since, Welsh Carson has controlled at least two seats on USAP's board of directors. Until 2017, Welsh Carson—in its own words—controlled USAP "in all practical respects" because it had the right to appoint the majority of USAP's board of directors and its chair and held the voting rights of almost all the company's other shareholders. Welsh Carson's Brian Regan and D. Scott Mackesy sat on USAP's board from its founding in 2012 until 2022 and 2021, respectively.

19.     By 2017, Welsh Carson's ownership of USAP was diluted to 44.8%, after granting equity to physicians USAP had acquired. That year, Welsh Carson sold part of its equity to Berkshire Partners and GIC Capital, retaining an ownership stake of roughly 23% that it held until at least September 2023. Even after selling part of its USAP stake in late 2017, Welsh Carson remained, as USAP's former CEO and Chairman put it, the "most influential" member of USAP's board.

20.     Welsh Carson currently has two directors on USAP's board. In addition, the current board Vice Chairman, Robert Coward, though not appointed by Welsh Carson, is affiliated with the firm. Before serving as Vice Chairman for USAP, Coward was an operating partner at Welsh Carson and CEO of USAP.

21.    While its formal ownership of USAP has changed, Welsh Carson has continuously directed USAP's merger and acquisition strategy, along with other aspects of its corporate strategy. Welsh Carson has controlled or directed USAP since its founding through the present. Indeed, Welsh Carson has crowned itself USAP's "primary architect." In 2014, one of the Welsh Carson partners most intimately involved with USAP's business stated that "our mandate is to be control investors."

22.    Welsh Carson directors on USAP's board retain duties to and interests in Welsh Carson. For instance, Brian Regan, who served on USAP's board from 2012 until 2022, also acted in his Welsh Carson capacity during that time. Specifically, he facilitated USAP's roll-up scheme by signing deal documents for several of the challenged acquisitions expressly on behalf of Welsh Carson and by negotiating USAP's market-allocation agreement with an unnamed group. Regan also directed Welsh Carson employees to facilitate USAP's consolidation scheme by identifying attractive acquisitions, securing funding, and negotiating with insurers.

23.    Pursuant to a series of management agreements and otherwise, Welsh Carson regularly provided USAP with various operational support since USAP was founded, including services related to corporate finance, acquisition due diligence, and strategic planning. At USAP's founding, when the company was

considerably smaller than it is today, USAP relied extensively on Welsh Carson

personnel. Over the years, USAP and Welsh Carson personnel have continued to

work together frequently and closely.

## FACTUAL ALLEGATIONS

### I.    USAP'S ANTICOMPETITIVE SERIAL ACQUISITION SCHEME

#### A.    Welsh Carson Conspires with Healthcare Executives to Monopolize Anesthesia Markets

24.    In early 2012, John Rizzo, a former executive at a large national

anesthesia group, emailed D. Scott Mackesy, a partner at Welsh Carson, seeking

investors for a new anesthesia practice: "New Day Anesthesia." Rizzo planned to

use an "aggressive 'buy and build' consolidation strategy" to establish a

nationwide presence. New Day would be renamed USAP just before acquiring

Greater Houston Anesthesiology.

25.    Mackesy connected Rizzo with Brian Regan, a junior partner at Welsh

Carson, who led the evaluation of whether Welsh Carson should invest in New

Day.  Rizzo and Regan presented New Day to Welsh Carson's partnership,

explaining that New Day would pursue an "anesthesiology consolidation strategy."

The "[g]oal for New Day" would be "to build a platform with national scale by

consolidating practices with high market share in a few key markets."

Consolidation was the centerpiece of the strategy because Welsh Carson

understood that market share would give New Day "[n]egotiating leverage with commercial payors" to raise prices.

26.     Welsh Carson agreed to invest in New Day and "[c]ommit[ted] $1-$2 million to set-up [sic] shop, develop a market roadmap, and diligence acquisition candidates" and "devote[d] real time and resources to New Day and the anesthesiology consolidation strategy."

27.     Welsh Carson recruited another healthcare executive with experience with "rolling up" physician practices, Kristen Bratberg, to help found and launch USAP and execute the monopolization scheme. Welsh Carson had already installed Bratberg as a CEO for another of its roll-up acquisition schemes. Bratberg would sit on the board of the new entity, from its founding in 2012 until December 2021. Bratberg would also serve as the new entity's CEO.

**B.    Defendants Begin Rolling up Houston with the Acquisition of Greater Houston Anesthesiology**

28.     Welsh Carson, together with Bratberg and Rizzo, then determined which anesthesia group should serve as the platform for New Day from which to "roll up" other practices.  Working with Dean & Company, a consultant, Defendants developed their so-called "Dean tool," which Defendants used for many years to determine attractive regions for acquisitions and practice groups in each region.

29.    During that time, Welsh Carson hired Bratberg to be New Day's CEO. Bratberg was hired because he had served as CEO for Pediatrix—Welsh Carson's physician group for neonatologists—overseeing more than 100 acquisitions as part of a similar consolidation strategy.

30.    Regan and Bratberg identified Greater Houston Anesthesiology as New Day's first acquisition. Greater Houston Anesthesiology described itself as "20 times the size of the second largest local competitor."  In June 2012, New Day and Welsh Carson, represented by Regan, signed a letter of interest with Greater Houston Anesthesiology. Welsh Carson and New Day then pitched the potential deal to Greater Houston Anesthesiology's physicians, highlighting their plan for aggressive consolidation.

31.    On August 13, 2012, New Day Anesthesia, Inc. and New Day Anesthesia Holdings, Inc. were incorporated. Both companies had the same board of directors: Brian Regan, D. Scott Mackesy, Kristen Bratberg, and John Rizzo. Later that month, on August 31, Greater Houston Anesthesiology, Welsh Carson, and New Day agreed to a three-month exclusivity period to negotiate the transaction.

32.    During that period, Welsh Carson enlisted three consulting groups to analyze whether New Day should acquire Greater Houston Anesthesiology. Each of the consulting groups recommended the deal. One, Avalere Health, noted that

anesthesiologists "have more power than most specialists," and that Greater Houston Anesthesiology's "commanding market share" only "magnified" its power. Another, Stax, Inc., noted that Greater Houston Anesthesiology was "the largest anesthesia physician group in the greater Houston region," as "the closest groups to GHA in size are academic in nature, with most independent groups being much smaller." Stax, Inc. also found that Greater Houston Anesthesiology was "well-positioned within the [Houston region], and specifically within the four major hospital systems"—Houston Methodist, Memorial Hermann, St. Luke's, and HCA, which performed almost 65% of all inpatient surgeries in Houston. The third, Savvy Sherpa, focused on prices, observing that Greater Houston Anesthesiology "achieved very good levels of reimbursement from commercial payers." Savvy Sherpa's analysis confirmed what Regan heard from an ambulatory surgical center executive—that Greater Houston Anesthesiology had the "best rates." Savvy Sherpa also suggested that New Day would be able to spread higher reimbursement rates to other practices it acquired.

33.     Welsh Carson then pitched the Greater Houston Anesthesiology acquisition to lenders in October 2012, highlighting its rates and "commanding market share." Regan explained that these attributes made Greater Houston Anesthesiology the perfect cornerstone from which to "build a platform with national scale by consolidating practices with high market share in a few key

markets." By capturing a dominant market share and creating national scale, New Day would have "[n]egotiating leverage with commercial payors" to raise anesthesia service prices. That pitch worked. General Electric Capital, KeyBank, Bank of America, Wells Fargo, Ares Capital, and others agreed to provide debt financing to New Day.

34.     Welsh Carson and New Day also sought and received financing from the Welsh Carson XI fund. In a 2012 memo to Welsh Carson's "Investment Professionals," Mackesy, Regan, and four other Welsh Carson employees made a similar pitch, explaining that Greater Houston Anesthesiology would be the first acquisition in a "roll-up strategy."

35.     With this funding secured, Welsh Carson, Rizzo, and Bratberg announced the formation of USAP on November 19, 2012.[3] USAP agreed to acquire Greater Houston Anesthesiology on December 12, 2012.

### C.     Defendants Continue their Consolidation Strategy by Acquiring Twelve Additional Anesthesia Practices in Houston, Dallas-Fort Worth and Austin

36.     The day after signing the deal to acquire Greater Houston Anesthesiology, USAP, represented by Bratberg and Rizzo, met with Regan and

---

[3] Press Release: "Welsh, Carson, Anderson & Stowe and Healthcare Industry Veterans Announce Formation of U.S. Anesthesia Partners, Inc.," dated November 19, 2012 ("Welsh, Carson, Anderson & Stowe . . . and industry veterans, Kristen Bratberg and John F. Rizzo, today announced the formation of U.S. Anesthesia Partners . . . .").

other Welsh Carson employees in New York to plan the next stages of USAP's

consolidation strategy. Following Welsh Carson's direction, USAP developed its

own strategy by focusing on its "value maximization plan," a "tool that Welsh

Carson introduced . . . to clarify and focus management's attention."

37.    A January 2013 presentation—bearing USAP and Welsh Carson's

logos—laid out a plan for USAP to "Roll Up Houston" through a series of "tuck-in

acquisitions" that could be folded into Greater Houston Anesthesiology, while

simultaneously expanding to other markets.

38.    One of the conspiracy's strategies to "bolster [USAP's] market share

and drive profitability" involved exploiting "sticky" exclusive contracts with

hospitals.  Welsh Carson and USAP planned both to buy practices with existing

exclusive hospital contracts and to continue buying exclusive contracts with

hospitals as physician groups were folded into USAP. Defendants targeted

hospitals and hospital systems that are important for insurers. A Welsh Carson

analyst explained the importance of contracts with major hospitals to a potential

lender: "[I]f a payor refuses to give us the pricing that we're looking for, then the

threat of us going out-of-network would be more painful on the payor than it would

be on us . . . [W]hen we cover every major hospital in the market, it doesn't really

have much of an impact on us.  All the while, the payor would be responsible for

reimbursing at out-of-network rates which are substantially higher than what we see on an in-network basis . . . ."

39.    Another of the conspiracy's strategies was to raise each practice's prices to match those of Greater Houston Anesthesiology upon acquisition. Regan, Bratberg, and the other Welsh Carson and USAP executives agreed that spreading Greater Houston Anesthesiology's reimbursement rates, some of the highest in Texas, would be a key part of USAP's expansion plans in Houston and beyond. USAP thus planned to supply hospitals with generally the same providers as before but at significantly higher reimbursement rates. USAP and Welsh Carson referred to these increases as "synergies," even though they were simply excess profits generated from consolidating the market.

40.    In sum, Welsh Carson, Rizzo, Bratberg, and USAP had developed a consolidation strategy, secured the funding and personnel to execute that strategy, and initiated that strategy by acquiring Greater Houston Anesthesiology.  They soon began the next stages of that plan.

41.    Defendants knew USAP had "room to expand its footprint throughout Texas" both within Houston and Beyond. Defendants identified Dallas-Fort Worth and Austin as attractive markets for expansion. Like Houston, four major hospital systems in Dallas conducted a large share of surgical cases: Texas Health Resources, Baylor Scott & White, HCA North Texas (operating as Medical City),

and Methodist Health System. Accordingly, each acquisition would increase USAP's market power and ability to raise prices. Between 2013 and 2020, USAP consolidated its market share in each of the relevant MSAs by acquiring three additional anesthesia practices in Houston, seven in Dallas-Fort Worth, and two in Austin. USAP also acquired three anesthesia practices in smaller markets to continue spreading its higher rates statewide and prevent other anesthesiologist groups from establishing a presence sufficient to compete with USAP in the Houston, Dallas-Fort Worth, and Austin MSAs.

42. Throughout the relevant period, Welsh Carson played a critical oversight role for USAP, including by voting as board members to approve each acquisition. Moreover, according to USAP's "Business Development Playbook," created in 2013, it is "important that [Welsh Carson] remains fully informed" and USAP's acquisitions "will typically involve multiple memos/presentation decks and discussions with [Welsh Carson]." Indeed, the Playbook explained, before USAP could send a letter of intent proposing an acquisition, "the deal must be reviewed and approved by Welsh Carson." On information and belief, these requirements remained in effect during the 2019-2020 timeframe. Accordingly, USAP needed Welsh Carson's approval before it would proceed with any acquisition, including the Star and Guardian acquisitions discussed below. And Welsh Carson allowed and directed USAP to make these

16

acquisitions, including the Star and Guardian acquisitions in 2019 and 2020, respectively.

### 1.    USAP Acquires Lake Travis Anesthesiology

43.    In July 2013, USAP acquired Lake Travis Anesthesiology, a small group that provided coverage for Lakeway Hospital in the Austin market.  USAP had already established a presence in Austin with its acquisition of Greater Houston Anesthesiology, which was the fourteenth largest group in the Austin area when USAP acquired it.  Notwithstanding its small size, USAP executives described this acquisition as a chance to get "points on the board" and to get a platform to "[c]ontinue GHA's expansion into [the] Austin MSA."

### 2.    USAP Acquires North Houston Anesthesiology-Kingwood Division

44.    In June 2014, USAP acquired a division of North Houston Anesthesiology located in Kingwood. The division housed 21 physicians and nine certified registered nurse anesthetists ("CRNAs").  Welsh Carson and USAP's acquisition plan targeted practices with important hospital contracts, and the Kingwood Division had "[s]trategic hospital affiliation[s]" with HCA Kingwood and Memorial Heimann Northeast.  This rendered USAP the "clear leader" in Houston hospital-based anesthesiology services—the next largest anesthesia group "less than 5% the size of USAP."  Following the Acquisition, USAP raised Kingwood's reimbursement rates.

17

### 3.    USAP Acquires Pinnacle Anesthesia Consultants

45.    In early 2013, Pinnacle Anesthesia Consultants contacted USAP about "explor[ing] potential business opportunities concerning future strategic partnerships."  Pinnacle was an ideal target for USAP because it was  estimated to house 26% of the anesthesia providers and perform about 40% of the anesthesia services in Dallas.  It also had a powerful presence in the four hospital systems: approximately 54% of the case volume in the HCA system, 52% in the Baylor system, 42% in the Texas Health Resources system, and 22% in the Methodist Dallas system.

46.    In a meeting with Rizzo, Bratberg, and Pinnacle CEO Michael Saunders, Pinnacle's President and Chairman Mike Hicks explained that "he has wanted to do what [USAP is] doing for years."  Indeed, Pinnacle had a "wish list" of acquisition targets that USAP would soon acquire itself: Anesthesia Consultants of Dallas, Excel Anesthesia Consultants, and North Texas Anesthesia Consultants.

47.    The possibility for more dominance intrigued USAP and Welsh Carson.  Regan found Pinnacle "an interesting opportunity" and "definitely a worthwhile discussion given the size of their group and market."  Similarly, Bratberg thought acquiring Pinnacle "[c]ould be strategically a huge step forward from a Texas and national standpoint."  Others at Welsh Carson observed the

18

acquisition had a "[s]ignificant potential revenue upside" because USAP could apply its Houston rates to Pinnacle.

48.    Again, USAP and Welsh Carson hired consulting firms to assess whether USAP should acquire Pinnacle.  These consultants reported that Pinnacle had exclusive hospital contracts—uncommon for Dallas—and that other anesthesia practices "pose[d] no strategic or competitive threat to Pinnacle."  Additionally, the consulting firms recommended that USAP subsequently acquire other practices providing anesthesia services to "key [hospital] system facilities not served by Pinnacle" to obtain more "exclusive contracts over time."

49.    On September 13, 2013, USAP, Welsh Carson, and Pinnacle signed a letter of intent stating that USAP intended to "expand throughout Texas by acquiring other local anesthesia groups."

50.    Before completing the Pinnacle acquisition, Welsh Carson and USAP adopted a wish list of acquisition targets in the Dallas area: Anesthesia Consultants of Dallas, Excel anesthesia Consultants, and North Texas Anesthesia Consultants.

51.    In January 2014, USAP completed the acquisition, and Pinnacle's 320 anesthesiologists and 217 CRNAs joined USAP's growing anesthesia empire.

52.    After the acquisition, USAP applied its inflated reimbursement rates to the former Pinnacle providers, thereby raising their rates.

53.    Insurers initially tried to resist, including one that treated the new USAP providers as out of network and arbitrated its reimbursement rates for over two years. But USAP prevailed in requiring insurers to accede to its higher rates.

54.    Afterward, Welsh Carson and USAP strategized how to prevent similar resistance after future acquisitions. Defendants developed a new contract clause, which they referred to as the "tuck-in clause," to clarify that USAP's rates would apply after an acquisition. USAP's Vice President of Payor Contracting, Alan Glenesk, sought Regan's approval on the drafting of this clause. USAP applied its bargaining power to impose this clause on insurers moving forward.

### 4.    USAP Acquires Anesthesia Consultants of Dallas

55.    In January 2015, USAP acquired Anesthesia Consultants of Dallas. The group had twenty-one physicians and twenty-nine CRNAs. Tom Swygert, a USAP anesthesiologist in Dallas, described Anesthesia Consultants of Dallas to Bratberg and Regan as one of the practices with "the largest number of anesthesiologists with specialized skill sets in the DFW market." Anesthesia Consultants of Dallas also had strong ties with major Dallas hospitals, including exclusive contracts with the Methodist Dallas flagship facility and a Texas Regional Medical Center facility. Additionally, Anesthesia Consultants of Dallas served other Methodist Dallas hospitals and another nine open-staffed hospitals. Swygert projected that USAP's acquisition of Anesthesia Consultants of Dallas

would "create a barrier to entry and promote our ability to garner system contracts."  USAP increased the reimbursement rates of Anesthesia Consultants of Dallas providers after it acquired the group.

### 5.    USAP Acquires Excel Anesthesia Consultants

56.    In March 2015, USAP acquired Excel Anesthesia Consultants. Excel had just merged with North Texas Anesthesia Consultants, bringing its ranks to fifty-five physicians and nineteen CRNAs.  Excel also had an exclusive contract with Health Presbyterian Hospital Dallas, the second largest hospital in the Texas Health Resources system, and served more than twenty hospitals across the four major systems.  USAP acquired Excel because its "broad reach and relationships across the Dallas market" would "[p]osition[] [USAP] to obtain exclusive facility contracts."  Regan called this acquisition "our most strategic move in the market next to [Anesthesia Consultants of Dallas]."

57.    USAP's acquisition of Excel also eliminated a competitor and raised barriers to entry. Excel already "compete[d] directly with some of the [Pinnacle] divisions . . . within the open-staff hospitals," and Regan feared that another group might acquire Excel to create "a 100 doc [sic] competitive practice with a strong sub specialty orientation in our backyard."  Acquiring Excel "create[d] a barrier to entry" by eliminating a possible foothold for would-be competitors.  USAP increased the reimbursement rates of Excel providers after this acquisition.

21

58.    Having checked off each of the Dallas groups on their Wishlist, Welsh Carson and USAP turned to smaller attractive groups in Dallas: Southwest, Anesthesia Associates, BMW Anesthesiology, Medical City Physicians, and Sundance Anesthesia.

### 6.    USAP Acquires Southwest Anesthesia Associates

59.    In December 2015, USAP acquired Southwest Anesthesia Associates. Although it was a smaller group in the Dallas market, it had an exclusive contract with Charlton Methodist in Dallas. USAP increased its reimbursement rates after acquiring Southwest.

### 7.    USAP Acquires BMW Anesthesiology

60.    In January 2016, USAP acquired BMW Anesthesiology and its nine anesthesiologists. USAP pursued this acquisition, along with its acquisition of the Medical City Physicians, to increase its case coverage at HCA's flagship facility, Medical City Dallas, from 30% to 80%. USAP recognized that BMW had "strategic value due to their strong participation in leadership roles in the Dallas HCA flagship hospital." USAP increased BMW reimbursement rates after acquiring BMW.

### 8.    USAP Acquires Medical City Physicians

61.    Also in January 2016, USAP acquired seven unaffiliated physicians referred to as Medical City Physicians. Medical City held "a key strategic position

22

within Medical City and HCA" because one of its physicians as the newly elected chief of anesthesia. USAP's acquisition of Medical City Physicians also helped USAP more than double its case coverage at Medical City Dallas. USAP increased Medical City Physician's reimbursement rates after acquiring it.

### 9.    USAP Acquires Sundance Anesthesia

62.    In April 2016, USAP acquired Sundance Anesthesia. Sundance was comprised of seven physicians and twenty-four CRNAs and had an exclusive contract with Texas Health Resources' Southwest Fort Worth hospital.  USAP's Chief Operating Officer called this acquisition "a huge win, that's a key THR site we didn't have. Great work[!]" USAP increased Sundance's reimbursement rates after the acquisition.

### 10.    USAP Acquires MetroWest Anesthesia Care

63.    In March 2017, USAP acquired MetroWest Anesthesia care. USAP viewed MetroWest as a "high-priority" target in the Houston market for two reasons. First, acquiring the group could eliminate a foothold for a potential competitor. Indeed, USAP's Director of Business Development worried that another large group would enter Houston and "spoil the entire market" by acquiring MetroWest. MetroWest had even considered selling to Sheridan Healthcare, now Envision Physician Services, in 2014. Accordingly, USAP

considered its acquisition of MetroWest as a "defensive" deal to "preserve the protected market."

64.    Second, MetroWest held exclusive contracts with hospitals in Houston's Memorial Hermann Health system, which had suggested it would be "moving to a single source anesthesia provider" by 2016. USAP was concerned that it would not win the single provider contract over MetroWest and instead acquired the group to "further expand its relationship with Memorial Hermann" without competing.

65.    After the acquisition, Blue Cross reported that USAP "[a]ccounted for . . . 69% of cases and 83% of cost in Houston" and that USAP "leverag[ed] market share" to establish rates that more than doubled those of other Houston anesthesiologists.

## 11.    **USAP Acquires Capitol Anesthesiology Association**

66.    In February 2018, USAP acquired Capitol Anesthesiology Association. Capitol had been on Welsh Carson's radar since 2013 and was the largest group in Austin with 80 physicians and 152 CRNAs.  Capitol had a "substantial market position in Austin": exclusive contracts with five of the eleven hospitals in the Seton system—the largest in Austin—and a presence at five others. Capitol also had exclusive contracts at multiple other Austin-area hospitals.

67.     After the acquisition, USAP increased Capitol's reimbursement rates. Capitol's Vice President of Operations and soon-to-be USAP executive celebrated these increases, exclaiming "Awesome! Cha-ching!"

### 12.    USAP Acquires Guardian Anesthesia Services

68.     In January 2020, with Welsh Carson's approval, USAP acquired Guardian Anesthesia Services, which had twenty-one physicians and fifty-six CRNAs. Defendants first singled out Guardian in 2013 because the group had exclusive contracts with three HCA hospitals in Houston. However, Guardian declined multiple bids from USAP and beat out USAP for an exclusive contract at HCA's new Pearland Hospital. Nevertheless, USAP ultimately eliminated competition from Guardian by acquiring it. USAP increased Guardian's reimbursement rates after the acquisition.

### D.    Defendants Acquire Three Practices in Tyler, Amarillo, and San Antonio to Preserve Monopoly and Pricing Power in Houston, Dallas, and Austin

### 1.    USAP Acquires East Texas Anesthesiology Associates

In June 2016, USAP acquired East Texas Anesthesiology associates in Tyler, Texas. USAP acquired East Texas because the group's twenty-three physicians and eleven CRNAs covered more than half of the cases and revenue at the East Texas Medical Center in Tyler. Additionally, the group had a near-exclusive contract with the University of Texas Health Science Center at Tyler.

After the acquisition, USAP increased East Texas Anesthesiology Associates'
reimbursement rates.

### 2.    USAP Acquires Amarillo Anesthesia Consultants

69.    In July 2018, USAP acquired Amarillo Anesthesia. The group had ten
physicians and ten CRNAs and dominated the Amarillo market: Cigna estimated
that it covered up to 85% of cases. Amarillo Anesthesia Consultants' relevance
extended beyond the local market via the exclusive contract it held with Baptist St.
Anthony's Hospital. Baptist St. Anthony's is the largest of Amarillo's two
hospitals and an important facility in the Ardent Health System—a system with
hospitals elsewhere in the state where USAP wanted exclusive agreements.  By
acquiring Amarillo Anesthesia, USAP prevented another large anesthesia group,
Metro/IPN, from acquiring Amarillo Anesthesia and gaining a foothold in
Amarillo and the Ardent Health System. USAP increased Amarillo Anesthesia's
reimbursement rates after the acquisition.

### 3.    USAP Acquires Star Anesthesia

70.    In September 2019, with Welsh Carson's approval, USAP acquired
San Antonio-based Star Anesthesia. Star housed one hundred and eighty-two
physicians and twelve CRNAs, which made it the largest remaining independent
anesthesia practice in Texas. USAP and Welsh Carson first marked Star as a
potential acquisition in 2013 because it had exclusive contracts with the HCA

co-owned Methodist San Antonio hospital system. Star was an increasingly competitive threat to USAP. It entered the Houston market in March 2016 by acquiring the division of North Houston Anesthesiology that had rejected USAP's offer in 2014. Worried about Star's relationship with HCA, Regan decided USAP "need[ed] to do a system deal with HCA and kick these guys [i.e., Star] out of town." USAP also attempted to acquire Star. For a while, Star resisted. It told at least one insurer that it planned to expand, and insurers sought to make Star "a statewide messenger model to be a competitor against USAP." But USAP's overtures ultimately succeeded, and it acquired Star in 2019. Afterward, USAP raised Star's reimbursement rates.

## II.    THE RELEVANT MARKETS

### A.    Hospital-Only Anesthesia Services Sold to Patients with Commercial Insurance and Uninsured Patients

71.    The relevant service market can be appropriately limited to hospital-only anesthesia.

72.    Anesthesia services are provided to patients to prevent them from feeling pain during medical procedures. Anesthesia is provided by physician anesthesiologists, who have a medical degree in the field, or certified registered nurse anesthetists ("CRNAs"), who are certified to administer anesthesia.

73.    Hospital-only anesthesia services are not interchangeable with those administered outside of a hospital. A patient whose medical treatment must be

27

administered in a hospital—due to the nature of the services or the patient's medical needs or risk factors—must receive associated anesthesia services in a hospital. The decision whether a patient must undergo a procedure in a hospital is based on many medical considerations, including the time to recuperate from surgery and the need to use anesthesia that may place the patient at risk to lose life-preserving protective reflexes. While this often overlaps with the decision to admit a patient overnight, there are medical procedures that must be performed in a hospital but do not require an overnight stay. Accordingly, while hospital-only anesthesia services may be performed by the same providers as other anesthesia services, the services themselves are nevertheless distinct because once it is determined the patient must be treated in a hospital, the patient cannot turn to non-hospital anesthesia services.

74.    These decisions are driven by non-negotiable medical conditions, so patients and insurers cannot switch from hospital-only anesthesia services to avoid a small but significant non-transitory increase in price. Nor can a patient forego anesthesia services altogether when they are deemed necessary. Once hospital-only anesthesia has been deemed necessary for a procedure, the patient must pay the amount for which they are responsible under their insurance plan or, for uninsured patients, the entire out-of-pocket amount.

75.     Unique features of healthcare markets inform the defined product market. The pressure that output and patient demand exert on price is less direct in the healthcare market than it is in a typical competitive market.

76.     For one, patients have a strong preference for hospital-only services near where they live. Importantly, a patient does not pick his or her anesthesiologist for hospital-only anesthesia services. Instead, the patient picks a nearby hospital, and the hospital provides the anesthesiologist. Anesthesia practices compete for contracts to provide hospital-only anesthesia services at hospitals. These contracts are often exclusive.

77.     Hospitals prefer local providers to avoid travel and lodging costs. Hospitals also need to secure a sufficient supply of anesthesiologists in order to staff procedures on 24 hours' notice or less. So, hospitals within each MSA will select anesthesia groups that have a significant number of doctors within the hospital's MSA.  Anesthesia providers outside a hospital's MSA are not a reasonable substitute for hospitals.

78.     Price also plays a weaker role in a patient's healthcare decision because their out-of-pocket cost for medical services is largely shaped by factors beyond their control.

79.     With respect to commercially insured patients, the price a patient pays for services under a healthcare plan is determined both by the price his or her

insurer negotiated with the provider and the specific features of his or her health insurance plan. While patients receive details about their commercial health plans when they select a plan, many of their medical needs—including the need for a procedure involving hospital-only anesthesia services—are not known at that time. The patient pays out-of-pocket expenses to the provider, not to his or her insurer.

80.     Uninsured patients likewise are unable to negotiate the price of hospital-only anesthesiology services. Uninsured patients are charged the full price for the anesthesiology services rendered. While price may be a larger factor in where to receive service for an uninsured patient than it is for an insured patient, proximity to the hospital where they receive the services is still the driving consideration.

81.     Additionally, for both commercially insured and uninsured patients, price does not strongly factor into patient choice at the point of service because healthcare is often non-deferable.

82.     The healthcare industry recognizes that hospital-only anesthesia services are distinct.

83.      The Centers for Medicare and Medicaid Services maintains a list of billing codes distinguishing between hospital and other anesthesia services. This list is used by government insurers, and many hospitals adopt the list to remain

certified for government insurance programs. Some private insurers also formally require similar billing practices.

84.    Hospitals also differentiate hospital-only anesthesia services. Some hospitals engage only one anesthesiology practice. This streamlines scheduling for the hospital by providing a central hub and enables the hospital to implement accountability-of-care quality measures within the practice. An anesthesiology provider must employ a certain number of physicians and staff procedures on a 24/7 basis to be the sole practice for a hospital. Non-hospital anesthesiology practices generally do not meet these requirements.

85.    Moreover, Defendants recognize hospital-only anesthesia services as a distinct market. USAP's acquisition strategy focused on the target's presence within hospital systems or individual facilities. Indeed, Greater Houston Anesthesiology was an attractive initial acquisition because it had a high "wallet share" at Houston's four largest hospital systems. USAP did not target ambulatory surgical centers or other providers that do not perform inpatient surgery.

86.    The market can also be appropriately limited to patients who are either insured by a commercial insurance plan or are uninsured.  Commercial and government-sponsored insurance serve different customers.  Private health insurance companies offer commercial insurance and associated services to individuals and employers.  These plans are typically linked to an insured

member's employment. Government-sponsored plans serve individuals who satisfy specific eligibility criteria, for instance age disability, or income, which are usually unrelated to their employment.

87.    Commercial insurers pay a price that is negotiated by the insurer and the provider. That price is distinct from the price paid by government-sponsored plans because those plans are tied to government fee schedules for particular services and have stricter eligibility requirements. Compared to plans tied to government fee schedules, like Medicaid and Medicare, anesthesiologists receive significantly higher reimbursement rates for services sold to commercial plans.

88.    The price paid by a patient with a commercial healthcare plan is determined in part by the price that patient's insurer negotiates with the provider. Once that negotiated price is established, the patient's out-of-pocket expense is determined by applying the specific details of his or her health insurance plan, including the deductible, copay, coinsurance, and other factors.

89.    USAP recognizes that commercial insurance is a distinct market and tracks its pricing and positioning with commercial insurers without reference to Medicare, Medicaid, or other plans with prices determined by a government fee schedule.

### B.    The Geographic Markets: the Houston, Dallas-Fort Worth, and Austin MSAs

90.    Thirteen of the sixteen acquired anesthesia practices are within one of the MSAs.

91.    The Houston, Dallas-Fort Worth, and Austin MSAs are three geographic markets relevant to assessing the competitive implications of USAP's conduct. From the perspective of a patient living near the Houston MSA, hospital-only anesthesia services offered outside the Houston MSA are not a substitute. The same is true of patients living in the Dallas-Fort Worth and Austin MSAs.

### 1.    The Houston MSA

92.    The Houston MSA is the relevant market to address the anticompetitive effects of USAP's conduct within Houston.

93.    The Houston MSA includes the following nine counties: Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

94.    Patients living and working in the Houston MSA seek hospital-only services close to where they live.  As discussed, the patient picks the hospital, and the hospital staffs the patient's procedure with an anesthesiologist.

95.    Hospitals in the Houston MSA contract with anesthesia groups that have a significant portion of doctors within the Houston MSA. Anesthesia

groups outside the Houston MSA may be less competitive for various reasons, including that they (1) cannot provide a sufficient number of physicians to staff procedures around the clock on short notice, (2) must provide travel and lodging for their anesthesiologists, or (3) may lack either a relationship with Houston hospitals or (4) a reputation in the Houston MSA.

96.     The first target of Defendants' acquisition scheme was Greater Houston Anesthesiology, "the largest anesthesia physician group in the greater Houston region," with 220 physicians and 180 CRNAs. In addition to its size, Greater Houston Anesthesiology boasted the highest reimbursement rates in Houston. These characteristics made it an ideal target for Defendants, and in December 2012, USAP initiated its consolidation strategy by acquiring Greater Houston Anesthesiology.

97.     Welsh Carson and USAP turned immediately to the next step of their plan. In an internal January 2013 presentation, Welsh Carson and USAP indicated that USAP would simultaneously "Roll Up Houston" through a series of "tuck-in acquisitions" and expand in other Texas cities. Defendants would target anesthesia practices holding exclusive contracts with hospitals that were considered important to insurers and fold those practices into Greater Houston Anesthesiology. This strategy sought to "bolster [USAP's] market share and drive profitability" without competing.

34

98.     In Houston, when USAP acquired North Houston Anesthesiology, MetroWest, and Guardian, it significantly raised rates while retaining enough volume to increase each practice's earnings. As of February 2020, United Healthcare reported that its reimbursement rates with USAP are 65% higher than its average in-network rate in Houston, and 95% higher than the median rate statewide. It was able to spread these higher rates because, by revenue, it is eight times larger than its next largest competitor in Houston, handles about 60% of the hospital-only cases, and accounts for nearly 70% of payors' hospital-only anesthesia costs. Indeed, USAP has grown in key hospital systems, including Memorial Hermann and HCA, where Greater Houston Anesthesiology was less present.

99.     USAP's ability to raise prices after each acquisition without sustaining a corresponding loss in patient volume demonstrates that a hypothetical monopolist in the Houston MSA could profitably impose small but significant non-transitory price increases.

### 2.     The Dallas-Fort Worth MSA

100.    The Dallas-Fort Worth MSA is the relevant market to address the anticompetitive effects of USAP's conduct within Dallas-Fort Worth.

101.   The Dallas-Fort Worth MSA includes the following thirteen counties: Collin, Dallas, Denton, Ellis, Hood, Hunt, Johnson, Kaufman, Parker, Rockwall, Somervell, Tarrant, and Wise.

102.   Patients living and working in the Dallas-Fort Worth MSA seek hospital-only services close to where they live.  As discussed, the patient picks the hospital, and the hospital staffs the patient's procedure with an anesthesiologist.

103.   Hospitals in the Dallas-Fort Worth MSA contract with anesthesia groups that have a significant portion of doctors within the Dallas-Fort Worth MSA. Anesthesia groups outside the Dallas-Fort Worth MSA may be less competitive for various reasons, including that they (1) cannot provide a sufficient number of physicians to staff procedures around the clock on short notice, (2) must provide travel and lodging for their anesthesiologists, or (3) may lack either a relationship with Dallas-Fort Worth hospitals or (4) a reputation in the Dallas-Fort Worth MSA.

104.   In September 2023, USAP had over 900 anesthesia providers in Dallas and was the exclusive provider at 13 of the largest 25 hospitals in the MSA, including Baylor Scott & White's Grapevine and Irving facilities along with that system's flagship facility—the Baylor University Medical Center.  USAP provided the majority of anesthesia services in another two of the largest hospitals.  USAP

has an agreement with Texas Health Resources to cover nine of its fourteen facilities on an exclusive basis until 2027. Finally, USAP is the exclusive provider at Methodist Health System's Dallas, Charlton, Midlothian, Mansfield, and Richardson hospitals and is a dominant provider at its McKinney hospital.

105. In Dallas-Fort Worth USAP significantly raised rates after acquiring Excel, Anesthesia Consultants of Dallas, BMW Anesthesiology, Medical City Physicians, and Sundance Anesthesia and still increased each practice's earnings. As a result, USAP has the highest contractor rates of any anesthesia provider in Dallas.

106. USAP's ability to raise prices after each acquisition without sustaining a corresponding loss in patient volume demonstrates that a hypothetical monopolist in the Dallas-Fort Worth MSA could profitably impose small but significant non-transitory price increases.

### 3.    The Austin MSA

107. The Austin MSA is the relevant market to address the anticompetitive effects of USAP's conduct within Austin.

108. The Austin MSA includes the following five counties: Bastrop, Caldwell, Hays, Travis, and Williamson.

109. Patients living and working in the Austin MSA seek hospital-only services close to where they live. As discussed, the patient picks the hospital,

and the hospital staffs the patient's procedure with an anesthesiologist.

110.   Hospitals in the Austin MSA contract with anesthesia groups that have a significant number of doctors within the Austin MSA. Anesthesia groups outside the Austin MSA may be less competitive for various reasons, including that they (1) cannot provide a sufficient number of physicians to staff procedures around the clock on short notice, (2) must provide travel and lodging for their anesthesiologists, or (3) may lack either a relationship with Austin hospitals or (4) a reputation in the Austin MSA.

111.   In Austin, USAP significantly raised rates after acquiring Capitol and retained sufficient volume to increase the practice's earnings. USAP's ability to raise prices without sustaining a corresponding loss in patient volume demonstrates that a hypothetical monopolist in the Austin MSA could profitably impose small but significant non-transitory price increases.

### 4.   Additional Evidence Confirming the Houston, Dallas-Fort Worth, and Austin MSAs are Relevant Geographic Markets

112.   The actions of insurance companies, regulatory requirements, and USAP's acquisitions outside the Houston, Dallas-Fort Worth, and Austin MSAs confirm they are the relevant geographic markets.

113.   The actions of insurance companies confirm the individual MSAs are the relevant geographic market.  Because employers decide which commercial health insurance to offer employees, insurers seek to build networks that include

38

sufficient providers where companies' employees live or work. Accordingly, employers with employees who live or work in one of the MSAs will be attracted to insurers with a robust network of providers in that MSA.

114.    Regulatory requirements also require insurance companies to provide networks in which patients are close to their providers. To issue healthcare insurance through Texas' federally-facilitated exchange, the Affordable Care Act requires insurers to "maintain[] a network that is sufficient in number and types of providers, . . . to ensure that all services will be accessible without unreasonable delay."[4] Texas also requires insurers to maintain networks such that "travel distances from any point in its service area to a point of service are no greater than" thirty miles for general hospital care and seventy-five miles for specialty care.[5]

115.    To preserve its pricing power in the Houston, Dallas-Fort Worth, and Austin MSAs, USAP acquired practices in smaller markets—Amarillo, Tyler, and San Antonio.  This prevented other groups from achieving a scale that could possibly challenge USAP within the Houston, Dallas-Fort Worth, and Austin MSAs.

---

[4] 45 C.F.R. § 156.230(a)(1)(ii) (2023).

[5] 28 Tex. Admin. Code §§ 11.1607(h), 3.3704(f) (2023).

116.   USAP's acquisition of Amarillo Anesthesia demonstrates that USAP's growing presence in Texas increased its negotiating leverage. Amarillo Anesthesia had as much as an 85% share of hospital-only services in Amarillo before USAP acquired it.  Insurers nevertheless successfully resisted Amarillo Anesthesia's demands to increase its reimbursement rates before it was acquired. Once it was acquired, however, USAP was able to raise its reimbursement rate from Blue Cross even though USAP's acquisition of Amarillo Anesthesia did not increase market concentration in that city. USAP also acquired Amarillo Anesthesia to prevent a Dallas-based group from building a presence in other MSAs.

117.   East Texas Anesthesiology Associates in Tyler also had a dominant position that allowed USAP to successfully raise reimbursement rates. East Texas had over 50% of case volume at East Texas Medical Center in Tyler and near-exclusive coverage at University of Texas Health Science Center at Tyler.

118.   Finally, San Antonio-based Star Anesthesia had expanded into Houston and announced its intentions to expand across Texas before USAP acquired it.

119.   USAP's anticompetitive acquisition plan has allowed it to impose monopoly prices on patients receiving its anesthesia services in the Houston, Dallas Fort-Worth, and Austin MSAs.

### III.   STATUTE OF LIMITATIONS

#### A.   Fraudulent Concealment

120.   Plaintiff and members of the proposed Class had neither actual nor constructive knowledge of the facts constituting their claim for relief until at least September 21, 2023, when the FTC filed and announced its suit against USAP and Welsh Carson. The agreements and discussions described herein regarding Welsh Carson and Rizzo's conspiracy to create USAP and execute its consolidation scheme were not generally accessible to the broader public.

121.   Information regarding USAP's anticompetitive price fixing agreements and serial acquisition scheme likewise was not generally accessible to the broader public. Defendants concealed the anticompetitive intent and anticompetitive effects of those acquisitions and instead deceptively described them as procompetitive. Thus, Plaintiff and proposed Class members did not and could not have known about Defendants' anticompetitive conduct until the FTC announced its civil suit.

122.   Defendants' anticompetitive conspiracy and actions were, by their very nature, self-concealing. Hospital-only anesthesia providers are not exempt from antitrust regulation, so Plaintiff reasonably considered the industry to be competitive until learning of the FTC action. Accordingly, a reasonable person

41

under the circumstances would not have realized the need to investigate the prices USAP charged.

123.    Plaintiff exercised reasonable diligence. Plaintiff and the proposed Class members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because Defendants deceptively concealed their anticompetitive scheme.

124.    Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the proposed Class members.

125.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, Defendants' repeated public statements that acquisitions would result in a better quality of care and efficiencies in the provision of that care.  Defendants claimed that USAP would be a more efficient anesthesiology firm with money to invest in quality. For instance, regarding USAP's "partnership" with Anesthesia Consultants of Dallas, a USAP news release stated that "USAP will invest in ACD's infrastructure, positioning the practice for continued growth and success." [6] That

---

[6] *Anesthesia Consultants of Dallas Joins Pinnacle Anesthesia in Partnership with USAP*, USAP.com (Jan. 22, 2015) https://www.usap.com/news-and-events/news/anesthesia-consultants-dallas-joins-pinnacle-anesthesia-partnership-usap.

release also quoted the managing partner of Anesthesia Consultants of Dallas: "Partnering with Pinnacle and USAP will facilitate our delivery of consistent, quality anesthesia services for our patients and facilities in the DFW market." Additionally, after USAP acquired Northeast Anesthesia group, a news release quoted Bratberg: "This transaction is consistent with our strategy of partnering with high quality groups in the markets we serve, supporting them with our investments in infrastructure, allowing them to collaborate with other USAP physicians and positioning them for continued growth and success in their markets."[7]

126.  These false representations and others like them were used to conceal the conspiracy.

127.  By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations was tolled and suspended with respect to any claims and rights of action accruing to Plaintiffs and the proposed Class members based on the unlawful combination and conspiracy alleged in this Complaint.

**B.**  **Suspension of Limitations**

---

[7] *Northeast Houston Anesthesia Group Joins Greater Houston Anesthesiology in Partnership with USAP*, USAP.com (Jun. 27, 2014) https://www.usap.com/news-and-events/news/northeast-houston-anesthesia-group-joins-greater-houston-anesthesiology.

128.   The statute of limitations extends at least as far back as September 21, 2019, four years before the FTC filed its complaint against Welsh Carson and USAP.  Pursuant to 15 U.S.C. § 16(i), when the United States institutes a civil proceeding "to prevent, restrain, or punish violations of any of the antitrust laws . . . the running of the statute of limitations in respect to every private . . . right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter." The claims that plaintiff brings on behalf of himself and the proposed Class are based in whole or in part on the allegations in the FTC's pending civil suit.

## IV.   <u>WELSH CARSON CONSPIRED TO MONOPOLIZE THE HOUSTON, DALLAS-FORT WORTH, AND AUSTIN MSAS</u>

### A.    <u>Phase 1: Welsh Carson and John Rizzo Hatch the Conspiracy to Monopolize the Relevant Markets</u>

129.   The conspiracy was initially formed when Welsh Carson, via Regan and Mackesy, agreed with Rizzo to form and launch a company that would consolidate market power in Texas anesthesia markets. Rizzo first approached Mackesy and Regan with a plan to monopolize markets in Texas via an "aggressive 'buy and build' consolidation strategy" in early 2012, with Bratberg joining the group shortly thereafter.

130.   The conspirators' plan was clear from the beginning. Regan, along

with other Welsh Carson employees, and Rizzo created a presentation to secure
approval and obtain funding for New Day, later renamed USAP, and Regan
delivered it to the Welsh Carson partnership on July 2, 2012. In that presentation,
Regan stated that they would build a national platform "by consolidating practices
with high market share in a few key markets" and achieve "[n]egotiating leverage
with commercial payors."  Put differently, the purpose of the conspiracy was to
create a monopolist capable of raising prices for anesthesia care. USAP was
created to be the platform for the acquisition scheme.

131.    The pitch was successful and Welsh Carson agreed to invest.
Specifically, according to Regan, Welsh Carson would "devote real time and
resources to New Day and the anesthesiology consolidation strategy." Initially,
Welsh Carson partners "[c]ommit[ted] $1-$2 million to set-up shop, develop a
market roadmap, and diligence acquisition candidates."

## B.  Phase 2: Welsh Carson Directs and Profits from the Conspiracy to Monopolize the Relevant Markets

132.    Welsh Carson committed numerous overt acts in furtherance of the
conspiracy. Welsh Carson was the "primary architect" of USAP's acquisition plan
and provided the initial funding necessary to create USAP and acquire Greater
Houston Anesthesiology. Ever since, Welsh Carson helped select and signed off on
each acquisition target.

133.   Welsh Carson hired Dean & Company to develop a methodology for

45

identifying attractive markets and practice groups to acquire in those markets.

134.    Welsh Carson also selected Bratberg, whom it had previously tapped for a similar roll up strategy, to be USAP's first CEO.

135.    Regan, in his capacity as a "General Partner" of "Welsh, Carson, Anderson & Stowe," signed the June 2012 letter of interest with Greater Houston Anesthesiology. Welsh Carson met with and ran due diligence on Greater Houston Anesthesiology. Welsh Carson and New Day pitched Greater Houston Anesthesiology on joining together to create USAP.

136.    On August 29, 2012, Regan signed a formal Letter of Intent to acquire Greater Houston Anesthesiology on behalf of WCAS Associates XI.  Bratberg and Rizzo signed the same letter for New Day. Welsh Carson also helped fund the acquisition.

137.    Bratberg and Rizzo then met with Regan and the Welsh Carson team to develop the next stages of the acquisition strategy. Welsh Carson directed USAP's development of a "value maximization plan" and oversaw USAP's implementation of that plan. Welsh Carson has regularly provided USAP with strategic, operational, and financial support since USAP's founding. As Welsh Carson previously announced, "WCAS partnered with USAP's management team to build [USAP] into one of the leading healthcare services franchises in the country[]."

138.   Welsh Carson continued to "partner" with USAP's management to grow and defend its anticompetitive market position after the 2017 recapitalization, continuing at least 2020. For example, Welsh Carson committed an overt act in furtherance of the conspiracy in connection with USAP's Guardian and Star acquisitions in September 2019 and January 2020, respectively. As noted above, Welsh Carson general partner Brian Regan was the one who determined that USAP needed to "kick [Star] out of town" in 2019. On information and belief, Welsh Carson, through Brian Regan and Scott Mackesy (the two Welsh Carson employees who initiated the conspiracy and helped found USAP), acting in their roles as the Welsh Carson-appointed board members of USAP, approved those acquisitions. On information and belief, both Regan and Mackesy voted to approve those acquisitions, which was required for those acquisitions to proceed, as did ~~and~~ Kristen Bratberg (USAP's co-founder and two-time CEO for Welsh Carson roll up acquisition schemes). On information and belief, Welsh Carson further approved and directed the replacement of Mr. Bratberg as USAP's CEO in 2021 by Robert Coward, another Welsh Carson employee, with the goal and intent that he protect USAP's monopolies and secure further anticompetitive profits for Welsh Carson.

139.   As of September 2023, Welsh Carson retained an ownership stake of approximately 23% in USAP. Before 2017, when it had authority to appoint the majority of USAP's board, Welsh Carson stated it controlled USAP "in all

practical respects" despite Welsh Carson's ownership stake falling below 50%. After 2017, when Welsh Carson cashed out a portion of its investment and initial profits from the anticompetitive scheme and lost the right to appoint the majority of USAP's board, it remained the "most influential" member of USAP's board according to USAP's former CEO and Chairman. On information and belief, Welsh Carson retained and continued to exercise its influential control of USAP's board through the present.

140.    Regan, one of the architects of Welsh Carson and USAP's rollup strategy, continued to serve on USAP's board through 2022 while also serving as a general partner of Welsh Carson, which he remains through the present. Two of USAP's current board members are Welsh Carson employees—one is a Vice President, the other a partner—and the board's Vice Chairman was an operating partner at Welsh Carson. Welsh Carson continues to obtain profits from the unlawful scheme, including through its investment in USAP.

141.    As demonstrated below, the conspiracy was successful.

## V.    <u>MONOPOLY POWER</u>

### A.    <u>USAP Leverages Its Monopoly Power to Charge Monopoly Prices</u>

142.    USAP's ability to control and raise prices regardless of local market dynamics is direct evidence of its monopoly power. USAP successfully imposed rate increases on patients. According to one insurer, USAP's rates in 2020 were

"nearly 40% more expensive than the average cost of all other anesthesia providers in Texas" and as much as 110% above the statewide median. This figure reflects increases that occurred within the Houston, Dallas-Fort Worth, and Austin MSAs. One insurer estimated that it spent approximately $119 million on USAP anesthesia services in Texas by 2016, the year that USAP achieved 40% market share by revenue statewide. Changes in quality or other factors do not explain these increases. One United Healthcare executive stated that USAP's "quality performance is not meaningfully better than their peers."

143.   USAP's price increases are consistent with academic literature studying how private equity ownership impacts healthcare costs.  One study found that contracting with a private equity-backed physician management company increases costs for anesthesia services at outpatient facilities by approximately 26% compared to facilities that contract with independent providers.[8] Private equity ownership increased prices across practice areas beyond anesthesiology, including dermatology, gastroenterology, and ophthalmology.[9]

---

[8] Ambar La Forgia et al., *Association of Physician Management Companies and Private Equity Investment With Commercial Health Care Prices Paid to Anesthesia Practitioners*, 182 JAMA Internal Med. 396, 410 (2022).

[9] Yashaswini Singh et al., *Association of private equity acquisition of physician practices with changes in health care spending*, JAMA Health F., Sept. 2, 2022, at 9.

### B.    Market Share and Concentration Data Demonstrate USAP's Monopoly Power

144.    USAP's dominant market share is further evidence of its monopoly power in the relevant markets. USAP is comprised of at least 813 anesthesiologists and at least 765 CRNAs across the three-MSA markets.

145.    Ordinarily, if an insurance company wanted to constrain the rates charged by an anesthesia group in any of the MSAs, the insurer could exclude the group from their network. But because USAP has monopoly power in each MSA, insurance companies cannot credibly threaten to exclude USAP from their networks. Specifically, excluding USAP would erode the insurance network's coverage in each MSA and burden patients with out-of-network claims that generally bear a higher cost than in-network claims.

### 1.    Houston MSA

146.    USAP has a dominant share of the Houston MSA. After acquiring Greater Houston Anesthesiology in 2013, USAP controlled about 50% of the Houston market for commercially insured, hospital-only anesthesiology services. In 2021, it had a nearly 70% market share by revenue. At that time, USAP's largest competitors, UT Physicians and North American Partners in Anesthesia, had 8.3% and 8.2% market share, respectively.  The remaining anesthesia groups in Houston had less than 4% market share each.

147.    By case volume, claims data from one major insurer show that USAP grew its Houston market share from roughly 36% in 2013 to nearly 60% in 2021. UT Physicians and North American Partners in Anesthesia had 13.3% and 8.1% market share, respectively. The next largest competitors had less than 5% market share each.

148.    The Houston MSA is highly concentrated under the Hefindahl-Hirschman Index ("HHI"). HHI is calculated by summing the square of each market participant's market share. For instance, a market comprised only of participant A that holds 80% market share and participant B that holds the remaining 20% will have a HHI of 6,800 points ($80^2+20^2$). Under the 2023 Merger Guidelines, a market with an HHI exceeding 1,800 points is highly concentrated.[10] A merger that increases a market's HHI by more than 100 points and causes the overall market's HHI to exceed 1,800 will be deemed presumptively anticompetitive.

149.    Measured by revenue, each of USAP's acquisitions following its initial acquisition of Greater Houston Anesthesiology resulted in a post-transaction HHI above 2,500 and increased the market HHI by more than 200 points.  This is illustrated in Figures 1 and 2 below:

---

[10] *See* U.S. Dep't of Just. & Fed. Trade Comm'n, *Merger Guidelines* § 2.1 (2023) (available at https://www.justice.gov/atr/merger-guidelines)



Figure 1: Houston Acquisitions, HHI by Case Volume



Figure 2: Houston Acquisitions, HHI by Revenue

### 2. **Dallas-Fort Worth MSA**

150.   USAP's consolidation strategy in Dallas-Fort Worth resulted in its acquisition of seven significant anesthesiology practices.  As a result, USAP

increased its market share from 46% in 2014 to 68% in 2021, measured by revenue.  The next largest competitors, Metropolitan Anesthesia Consultants and UT Physicians, had 7.4% and 4.9% market share, respectively. The remaining competitors had less than 3.5% market share.

151.    By case volume, claims data from one major insurer show that USAP grew its Dallas-Fort Worth market share from roughly 42% in 2014 to nearly 60% in 2021.  Metropolitan Anesthesia Consultants and UT Physicians had 9% and 8.3% market share, respectively.  The remaining competitors had less than 5% market share.

152.    The Dallas-Fort Worth MSA is highly concentrated under the Hefindahl-Hirschman Index.  After entering the market with its acquisition of Pinnacle, USAP's acquisitions of Excel and Sundance Anesthesia resulted in a post-transaction HHI over 2,500 and increases exceeding 200, measured by revenue. The impact of each acquisition on the HHI for Dallas is expressed in Figures 3 and 4 below:





### 3. **Austin MSA**

153.    USAP charges the highest rates in Austin but has nevertheless

increased its market share of case volume and revenue significantly. From 2014 to

2021, USAP's share of case volume grew from 3.5% to 44.2% and its share of

anesthesia costs ballooned from 5.1% to 52.5%. USAP's next largest competitor,

North American Partners in Anesthesia, had 37.8% market share by case volume

and 37.2% market share by revenue.  The remaining competitors each had less than

3% market share by case volume and less than 1.5% market share by revenue.

154.   USAP did not lose any exclusive contracts with high-volume hospitals

or hospital systems during this time period.

155.   The Austin MSA is highly concentrated under the Hefindahl-

Hirschman Index.  After entering the market with its acquisition of Lake Travis

Anesthesiology, USAP's acquisition of Capitol Anesthesia resulted in a post-

transaction HHI over 2,500 and increases exceeding 200, measured by revenue and

case volume. The impact of this acquisition on the HHI for Austin is expressed in

Figures 5 and 6:





156.    The above measures of case share in each MSA may underestimate USAP's market share because they include commercially insured hospital-only anesthesia services provided at academic medical centers by professors, residents, and fellows. Put differently, those measures treat services provided by academic anesthesia groups as similar to those provided by independent groups. This may understate USAP's market share because academic anesthesiologists may not be substitutes for nearby non-academic providers due to institutional constraints on service. For instance, anesthesia services at academic medical centers related to their educational mission must be provided by academic anesthesia groups. Payors therefore do not necessarily consider them when evaluating provider dominance, and the industry typically views academic anesthesia groups differently than independent anesthesia groups. Excluding academic groups, one insurer estimated

that USAP controlled "over 80% of anesthesia in Houston in 2020" and had "similar dominance" in Dallas Fort-Worth. For example, one insurer estimated that in 2020, USAP controlled "over 80% of anesthesia in Houston" and had "similar dominance" in Dallas-Fort Worth, excluding academic groups.

157.    In sum, USAP possesses a dominant market share in the individual MSAs. It holds more than 50% of the case volume in Dallas-Fort Worth and Houston, and it generates more than 50% of the revenue in Houston, Dallas-Fort Worth, and Austin MSAs.



Figure 7: USAP's Share in Individual MSAs in 2021

158.    Taken together, USAP's share in, and the overall concentration of, each relevant MSA provides evidence of USAP's monopoly power.

### C.   USAP's Monopoly Power Is Durable and Resistant to Competition.

159.   Despite regular price increases, USAP's market share only increased because it was unthreatened by competition. In 2015, an associate at Welsh Carson bragged to lenders that USAP's contract retention rate had "effectively been 100%."

160.   Potential competing providers cannot quickly enter the market. For one, individual anesthesiologists and CRNAs must undergo years of education and training and must obtain a license from a state regulatory board.  Anesthesia providers also cannot easily increase their volume of cases.  Providing adequate medical care to patients necessarily caps the output of an anesthesiologist or CRNA.  Furthermore, demand for anesthesiology is highly price-inelastic, like most non-elective healthcare.  In other words, a new entrant with lower prices could not expect to generate and capture new demand for anesthesiology; demand for anesthesiology services depends on doctors' collective medical decisions about which procedures to recommend to patients, not the price of anesthesia.

161.   The use of exclusive contracts and the fact that USAP holds a high number of them poses another barrier to entry.  Exclusive contracts are "sticky." Hospitals rarely change providers in part because payors, not hospitals, pay for anesthesia. To compete for those contracts, an anesthesiology group must be large enough to staff a hospital.  Establishing such a group would require recruiting

providers or acquiring multiple independent practices. USAP has made these already difficult tasks nearly impossible. Its contracts with providers include a carrot and stick to prevent attrition: equity vesting rules incentivize providers to stay with USAP or lose out financially, and non-compete clauses prevent providers from leaving to join nearby anesthesia groups.

### D.    The Monopolization Scheme Lowered the Quality of Anesthesia Services in the Relevant Markets

162.    Private equity consolidation is at odds with high quality healthcare. Firms like Welsh Carson typically aim to exit investments within three to seven years and earn an annual return of at least 20%.[11] Academics have observed that the private equity model sacrifices quality of care to generate short-term returns for investors. The "rollup strategy, where a large platform practice is acquired and additional practices are 'added on,' gives the firm increased market power in a specialty or geographic region. . . . Ultimately, in such settings, consolidation leads to higher costs and lower quality care."[12]

---

[11] Sajith Matthews & Renato Roxas, *Private equity and its effect on patients: a window into the future*, 23 Int'l J. Health Econ. Mgmt. 673, 674 (2023).

[12] *Id.*

163.    Quantitative studies have found that private equity ownership lowered quality of care in nursing homes, dialysis provision, and hospitals.[13] Staffing levels suffered in each setting. Such outcomes are the natural consequence of private equity's "focus on generating cash flow and exiting the investment in a five-year window," a strategy that "puts pressure on doctors to increase volumes of patients seen per day."[14]

164.    As is typical of private equity ownership, USAP exhibited a singular focus on amassing market share that degraded the quality of hospital-only anesthesia services. According to a former USAP anesthesiologist in Colorado, "the firm's relentless drive to grow burned out physicians which, he said, detracted from quality."[15]

---

[13] Charlene Harrington et al., *Nurse Staffing and Deficiencies in the Largest For- Profit Nursing Home Chains and Chains Owned By Private Equity Companies*, 47 Health Serv. Res. 106, 118 (2011); Thomas G. Wollmann, *How to Get Away with Merger: Stealth Consolidation and Its Real Effects on US Healthcare* 34 (Nat'l Bureau of Econ. Rsch., Working Paper No. 27274, 2021); Joseph Bruch et al., *Characteristics of Private Equity-Owned Hospitals in 2018*, 174 Ann. Internal Med. 277, 278 (2021).

[14] Eileen Appelbaum, *Private Equity Buyouts in Healthcare: Who Wins, Who Loses*? 3 (Inst. for New Econ. Thinking, Working Paper No. 118, 2020).

[15] Peter Whoriskey, *Financiers bought up anesthesia practices, then raised prices*, Wash. Post (June 29, 2023), https://www.washingtonpost.com/business/2023/06/29/private-equity-medical-practices-raise-prices/.

165.   This degradation in quality has led at least fifty patients or family members to file malpractices cases against USAP in Texas since 2012.[16]

**E.    Defendants' Scheme Did Not Create Efficiencies That Benefited Patients**

166.   Documents internal to USAP and Welsh Carson show their strategy hinged on capturing dominant market share to create "[n]egotiating leverage with commercial payors" and not efficiencies to be passed on to patients (or payors) in the form of lower costs or higher quality care. Indeed, private equity consolidation offers virtually no unique efficiencies. Firms like Welsh Carson have little to no medical expertise. Providers can also obtain potential efficiencies associated with economies of scale without selling to a physician management organization. For example, providers could lower costs by joining a group purchasing organization or contracting with a back-office administrator. Furthermore, anesthesiology's overhead costs are relatively low compared to other practices, further limiting the opportunities for "efficiencies." Anesthesiologists rarely rent or own office space because they treat patients at hospitals or other facilities.

167.   Instead, the upside for private equity firms engaging in similar "roll-up" consolidation strategies consists of creating market power, as discussed above, and accounting arbitrage.  "Smaller acquisitions are purchased at 2-4x EBITDA

---

[16] *See* Compl., Ex. 1, *Elec. Medical Trust v. U.S. Anesthesia Partners*, Case No. 4:23-cv-04398 (May 13, 2024, S.D. Tex.), ECF No. 1-1

[earnings before interest, taxes, depreciation and amortization], while platform practices are purchased at 8-12x EBITDA. Once the practices are merged, the smaller practice's valuation increases and becomes that of the larger practice (8-12x EBITDA)."[17] Private equity firms are thus able to profit from consolidation without creating meaningful or pro-competitive efficiencies. Welsh Carson profited this way in 2017, when it sold approximately 50% of its stake in USAP to Berkshire Partners and GIC Capital. And to the extent any of these acquisitions did reduce any overhead, the resulting concentration in the market guaranteed that the benefit would be reaped by USAP, as opposed to patients or payors.

### F.    Defendants' Violation of the Antitrust Laws Has Had a Continuing Impact

168.    Defendants initiated their anticompetitive anesthesia consolidation scheme in 2012 with the acquisition of Greater Houston Anesthesiology. Defendants furthered their scheme by acquiring at least another fifteen anesthesia physician groups in Texas. Most recently, in January 2020, USAP acquired Guardian Anesthesia Services. Each acquisition built USAP's pricing power by giving USAP additional negotiating leverage with insurers, resulting in higher costs for insured patients. The impact of Defendants' conduct continues to be felt

---

[17] Matthews, *supra* note 11, at 674.

in every anesthesia reimbursement for which USAP receives higher rates than it would have absent this consolidation.

## VI.    USAP ALSO AGREED TO FIX PRICES WITH AT LEAST THREE GROUPS

169.    When Welsh Carson and USAP could not buy their competitors, they instead sought to "work something out that would be mutually beneficial and acceptable to everyone."  Specifically, Defendants implemented price-fixing agreements with at least three independent anesthesia groups in Houston and Dallas. USAP also tried to reach similar agreements with other groups.  Under each agreement, another group assigned USAP authority to bill and receive reimbursements for hospital-only anesthesia services provided by their physicians. USAP used that authority to charge its higher rates.

170.    USAP's executives were aware that these agreements were illicit.

171.    One executive remarked that it "seems odd from a compliance standpoint" for USAP to bill for services provided by another group and "keep[] the revenue." USAP's Vice President of Payor Relations was concerned these agreements "might possibly compromise" USAP's obligation to insurers "due to compliance issues related to pass through billing."

A.    **USAP's Agreement with Methodist Hospital Physician Organization**

172.    Upon acquiring Greater Houston Anesthesiology, USAP adopted a price-fixing agreement with Methodist Hospital Physician Organization, a non-profit anesthesia group associated with the Houston Methodist Hospital and Weill Cornell School of Medicine. Because Methodist Hospital Physician Organization is an academic group, it was not a natural acquisition target for USAP. For example, one academic group explained that it "d[id] not view USAP employment as a viable option."

173.    In July 2005, Greater Houston Anesthesiology had agreed to retain Methodist's anesthesia providers to serve Houston Methodist Hospital. Under that contract, "GHA will bill and collect, in the name of GHA and using GHA provider numbers, for Services furnished by" Methodist's providers. In exchange, Methodist assigned to Greater Houston Anesthesiology authority to bill and receive payments for those services. Greater Houston Anesthesiology used its billing authority to charge higher reimbursement rates for Methodist's services.

174.    Greater Houston Anesthesiology used that contract to secure an exclusive contract with the Houston Methodist Hospital. Under the exclusive contract, Greater Houston Anesthesiology was required to "provide seamless Anesthesia Services with TMH[PO] physicians" and retain "anesthesiologists

employed by TMHPO, including, but not limited to cardiovascular

anesthesiologists" to serve the hospital.

175. Since acquiring Greater Houston Anesthesiology in late 2012, USAP

continued to set Methodist Hospital Physician's reimbursement rates and bill

payors at that higher rate. USAP's pricing authority under this agreement is

unnecessary because USAP could have provided administrative services without

the authority to determine a competitor's prices. Indeed, USAP has done so at least

once. USAP's price-fixing agreement caused Plaintiff and the Class to pay more

than they otherwise would have for hospital-only anesthesia services.

176. USAP's agreement with Methodist Hospital Physician Organization

remained active until at least September 2023.

### B.    **USAP's Agreement with Dallas Anesthesiology Associates**

177. USAP also adopted a price-fixing agreement with Dallas

Anesthesiology Associates when it acquired Pinnacle.

178. In October 2008, Pinnacle won an exclusive contract to provide

anesthesia services to Baylor University Medical Center. Under that contract,

however, Pinnacle agreed to staff the hospital "together with Dallas Anesthesia

[sic] Associates," an independent group with twenty providers that had a strong

relationship with the hospital. Accordingly, Pinnacle entered an agreement with

Dallas Anesthesiology Associates under which Pinnacle would provide anesthesia

services at Baylor University Medical Center in exchange for Dallas Anesthesiology Associates allowing Pinnacle to "bill and collect, or cause to be billed and collected" reimbursements for those services using Dallas Anesthesiology Associates' name and tax identification number. Dallas Anesthesiology Associates also assigned "all of [their] rights and interest in receiving payment" to Pinnacle. Under that agreement, Pinnacle set the rates it charged payors for anesthesia services provided by Dallas Anesthesiology Associates.

179. Since acquiring Pinnacle in 2014, USAP continues to set Dallas Anesthesiology Associates' reimbursement rates and bill payors at that higher rate for services that the other group provided at Baylor University Medical Center. USAP's pricing authority under this agreement was unnecessary because USAP could have provided administrative services without the authority to determine a competitor's prices, as it has done at least once. USAP "collects a nice margin on the business" because it compensates Dallas Anesthesiology Associates based on that group's lower rate.

180. Pinnacle and USAP fraudulently concealed this agreement from patients and payors. Pinnacle, and later USAP, agreed to bill "patients in the service provider Physician's name" and "provide a telephone number that will be provided on the billing documents. Calls received at the telephone number will be

answered as 'Dallas Anesthesiology Associates' by Pinnacle." Because of this price-fixing agreement, Plaintiff and the Class paid more than they otherwise would for hospital-only anesthesia services.

181. This agreement also enabled USAP to develop a more substantial presence at an important Houston hospital system, thus growing its negotiating leverage with insurers and cementing USAP's monopoly power.

182. USAP's agreement with Dallas Anesthesiology Associates lasted until at least September 2023.

### C.   **USAP's Agreement with Baylor College of Medicine**

183. The Baylor College of Medicine anesthesia group had fifty anesthesiologists and was the second largest in Houston by procedure volume in 2012. In 2013, the year before it entered the price-fixing agreement with USAP, Baylor College of Medicine directly competed with USAP to provide anesthesia services at St. Luke's Health, one of the primary hospital systems in Houston. USAP once again hired Stax, Inc. to assess that group. Ultimately, it was deemed not to be an attractive target because acquisition by USAP would cause the group to lose its valuable affiliation with Baylor College of Medicine. Welsh Carson's Regan proposed a different solution: "[I]f Baylor is really pushing for a piece of the anesthesia, get us in a room with them. Maybe we could work something out that would be mutually beneficial and acceptable to everyone."

184.   The solution reached was another price-fixing agreement.  On October 23, 2014, USAP and Baylor College of Medicine entered into an "Anesthesia Services Collaboration Agreement."  Baylor College of Medicine would provide Baylor St. Luke's anesthesia services, and USAP would bill for those services as if it were the provider. USAP charged higher rates and received all resulting payments.  Because of this price-fixing agreement, Plaintiff and the Class paid more than they otherwise would have for hospital-only anesthesia services.  USAP faithfully executed this agreement until its termination in 2020.  USAP's pricing authority was unnecessary. USAP could have provided administrative services without pricing authority over a competitor's prices and has done so at least once.

185.   This agreement also enabled USAP to develop a more substantial presence at an important Houston hospital system, thus growing its negotiating leverage with insurers and cementing USAP's monopoly power.

186.   USAP's agreement with Baylor College of Medicine lasted until 2020.

### D.   USAP's Attempted Agreement with a University of Texas Group

187.   USAP also attempted to negotiate a price-fixing agreement with a group of eighty-four anesthesiologists affiliated with the University of Texas. USAP first identified an "alliance with UT" as a "significant rate opportunity" in 2013.  The two parties negotiated in June 2014.  In term sheets the parties

contemplated that the University of Texas group would assign USAP its exclusive contract with Memorial Hermann's Texas Medical Center in Houston.  In exchange, USAP would hire the group's physicians as contractors to serve the hospital and then bill payors at USAP's reimbursement rates.  USAP and the University of Texas group resumed negotiations in 2020 without success.

188.    USAP also sought to reach a similar agreement with Guardian Anesthesia Services before it acquired that company.

## VII.  <u>THE FEDERAL TRADE COMMISSION FILES SUIT</u>

189.    On September 21, 2023, the Federal Trade Commission ("FTC") filed suit against Welsh Carson and USAP in the United States District Court for the Southern District of Texas.  The FTC complaint alleges substantially the same misconduct as that which Plaintiff alleges here.  The FTC supports those allegations with non-public information about USAP's acquisitions, reimbursement rates, and anticompetitive agreements.  The FTC seeks a permanent injunction and other equitable relief.

## VIII.  <u>EMPLOYEE BENEFIT PLANS FILE SUIT</u>

190.    On November 20, 2023, a group of employee benefit plans filed a class action complaint against Welsh Carson and USAP in the United States

District Court of the Southern District of Texas.[18] The benefit plans' complaint alleges substantially the same misconduct as that which Plaintiff alleges here and seeks a permanent injunction and other equitable relief as well as damages.

## IX.    <u>USAP ALSO AGREED TO ALLOCATE A MARKET</u>

191.    The FTC complaint also alleges that USAP agreed to allocate a market with a potential rival and that the agreement "had the purpose and effect of keeping [redacted]—a significant potential competitor—out of the [redacted] market for anesthesia services."[19] Because of this market allocation agreement, Plaintiff and the Class paid more than they otherwise would have for hospital-only anesthesia services.

## <u>CLASS ACTION ALLEGATIONS</u>

192.    Plaintiff brings this action as representatives of a class under Rule 23, Federal Rules of Civil Procedure § 23(b)(2). Plaintiff also brings this action as representatives of a class seeking damages under Rule 23(b)(3).

193.    The Class is defined as follows:

All natural persons who, at least as far back as September 21, 2019, ("the Class Period"), paid all or a part of the cost of hospital-only anesthesia

---

[18] Compl., *Elec. Med. Trust v. U.S. Anesthesia Partners, Inc.*, Case No. 4:23-cv-04398 (S.D. Tex. Nov. 20, 2023), ECF No. 1.

[19] Compl. at ¶ 215, *Fed. Trade Comm'n v. U.S. Anesthesia Partners, Inc.*, No. 4:23-cv-03560 (S.D. Tex. Sept. 21, 2023), ECF No. 1.

services provided by USAP or its co-conspirators in the Houston, Dallas-Fort Worth, or Austin MSAs.

194.   The following persons and claims are excluded from the Class:

a.   Defendants, including any officers, directors, employees, subsidiaries, and affiliates; and

b.   Federal and state government entities.

c.   Patients who paid only a flat copay amount for the relevant services.

d.   Patients who are insured only by a government-sponsored medical plan such as Medicare or Medicaid.

## A.   **Numerosity (Rule 23(a)(1))**

195.   The Class is so numerous that joinder of all persons in the Class is impracticable.  At minimum, thousands of patients are within the defined Class.

## B.   **Commonality (Rule 23(a)(2))**

196.   There are common questions of law and fact affecting the rights of the members of the Class, including, without limitation:

197.   Whether USAP's acquisitions substantially lessened competition or tended to create a monopoly in the hospital-only anesthesia services market in Texas;

198.   The definition of the relevant market(s) and whether Defendants wielded pricing power in those market(s);

199.    Whether the acquisitions or agreements had anticompetitive effects in the relevant market(s);

200.    Whether prices charged by USAP and its co-conspirators for hospital-only anesthesia services were artificially inflated as a result of the acquisitions or agreement;

201.    Whether, and to what extent, Defendants' conduct caused injury to Plaintiff and the Class;

202.    Whether the alleged conduct violated the Clayton Act;

203.    Whether the alleged conduct violated the Sherman Act;

204.    What injunctive and other equitable relief is appropriate; and

205.    What Class-wide measure of damages is appropriate.

**C.    Typicality (Rule 23(a)(3))**

206.    The claims of the named Class representatives are typical of the claims of the proposed Class. Plaintiff and all members of the proposed Class sustained the same or similar injuries arising out of and caused by Defendants' common course of conduct in violation of applicable Federal law, in each Plaintiff and Class member paid artificially inflated prices as a result of the acquisitions and agreements.

### D.    <u>Adequacy (Rule 23(a)(4) and 23(g))</u>

207.    The named representatives will fairly and adequately protect the interests of the proposed Class. There are no conflicts between the named Class representatives and the other members of the proposed Class.

### E.    <u>Rule 23(b)(2)</u>

208.    This action is maintainable as a class action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate, injunctive, and other equitable relief in favor of the Class.

### F.    <u>Rule 23(b)(3)</u>

209.    Questions of law and fact common to the Class members, including legal and factual issues relating to violation and damages, predominate over any questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class. Class treatment offers a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured

persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in managing this class action.

## **VIOLATIONS**

## **COUNT ONE**

**Monopolization**
**Section Two of the Sherman Act**

210.    Plaintiff incorporates the above paragraphs as though fully set forth herein.

211.    Defendants' anticompetitive conduct set forth in this Complaint has violated Section Two of the Sherman Act. *See* 15 U.S.C. § 2.

212.    USAP has monopoly power in the markets for hospital-only anesthesia services in the Houston, Dallas, and Austin MSAs.

213.    USAP willfully acquired that monopoly by engaging in anticompetitive acquisitions of at least sixteen anesthesiology groups across Texas. With each acquisition, USAP's negotiating leverage with patients grew and enabled it to charge supra-competitive prices for services in the relevant markets, just as Defendants intended.

214.    Defendants' monopolization of the relevant markets occurred in or affected interstate commerce.

215.    As a result of Defendants' monopolization, Plaintiff and the Proposed Class suffered, and will continue to suffer, an antitrust injury because they paid, and will continue to pay, higher prices for hospital-only anesthesia services than they otherwise would have.

216.    Pursuant to Section Four of the Clayton Act, 15 U.S.C. § 15, Plaintiff seeks to recover treble damages and other relief prayed for below.

## COUNT TWO

### Unlawful Acquisition
### Section Seven of the Clayton Act

217.    Plaintiff incorporates the above paragraphs as though fully set forth herein.

218.    Defendants' anticompetitive conduct set forth in this Complaint has violated Section Seven of the Clayton Act. *See* 15 U.S.C. § 18.

219.    USAP devised a strategy to substantially lessen competition in the markets for hospital-only anesthesia in the Houston, Dallas, and Austin MSAs. Defendants executed that strategy by acquiring at least sixteen anesthesiology groups across Texas.  Those acquisitions were horizontal—USAP competed with the acquired practices in the relevant markets.  With each acquisition, USAP's negotiating leverage with patients grew and enabled it to charge supra-competitive prices for services in the relevant markets, just as Defendants intended.  This substantially lessened competition for anesthesia services in those markets.

220. The threat of new entry has not prevented Defendants from substantially lessening competition because significant barriers to entry exist.

221. Defendants' strategy to substantially lessen competition in the relevant markets for hospital-only anesthesia services occurred in or affected interstate commerce.

222. As a result of Defendants' several anticompetitive acquisitions, Plaintiff and the Proposed Class have suffered, and will continue to suffer, an antitrust injury because they paid, and will continue to pay, higher prices for hospital-only anesthesia services than they otherwise would have. Pursuant to Section Four of the Clayton Act, 15 U.S.C. § 15, Plaintiff seeks to recover treble damages and other relief prayed for below.

## COUNT THREE

### Conspiracy to Monopolize
### Section Two of the Sherman Act

223. Plaintiff incorporates the above paragraphs as though fully set forth herein.

224. Defendants' conspiracy to monopolize hospital-only anesthesia services in the Houston, Dallas-Fort Worth, and Austin MSAs set forth in this Complaint has violated Section Two of the Sherman Act. See 15 U.S.C. § 2.

225. Defendants knowingly entered into an agreement, understanding, or conspiracy to monopolize hospital-only anesthesia services in the relevant markets.

76

Defendants committed numerous overt acts in furtherance of this conspiracy, including voting to approve each acquisition, and had the specific intent to monopolize the relevant markets.

226.    USAP and Welsh Carson's conspiracy to monopolize hospital-only anesthesia services in the relevant markets occurred in or has had an effect on interstate commerce.

227.    As a result of Defendants' conspiracy to monopolize, Plaintiff and the Proposed Class have suffered, and will continue to suffer, an antitrust injury because they paid, and will continue to pay, higher prices for hospital-only anesthesia services than they otherwise would have.

228.    Pursuant to Section Four of the Clayton Act, 15 U.S.C. § 15, Plaintiff seeks to recover treble damages and other relief prayed for below.

## <u>COUNT FOUR</u>

### Attempted Monopolization
### Section Two of the Sherman Act

229.    Plaintiff incorporates the above paragraphs as though fully set forth herein.

230.    Defendants' anticompetitive conduct set forth in this Complaint has violated Section Two of the Sherman Act. *See* 15 U.S.C. § 2.

231.    Defendants attempted to monopolize the markets for hospital-only anesthesia services in the Houston, Dallas, and Austin MSAs.

232.    Defendants attempted to monopolize these markets by engaging in anticompetitive acquisitions of at least sixteen anesthesiology groups across Texas. With each acquisition, Defendants intended to increase USAP's negotiating leverage with patients so it could charge supra-competitive prices.

233.    Defendants had the specific intent to achieve monopoly power for USAP in the relevant markets.

234.    There was a dangerous probability that USAP would achieve its goal of obtaining monopoly power in those markets for hospital-only anesthesia services.

235.    Defendants' attempt to monopolize hospital-only anesthesia services in the relevant markets occurred in or had an effect on interstate commerce.

236.    As a result of Defendants' attempted monopolization, Plaintiff and the Proposed Class have suffered, and will continue to suffer, an antitrust injury because they paid, and will continue to pay, higher prices for hospital-only anesthesia services than they otherwise would have.

237.    Pursuant to Section Four of the Clayton Act, 15 U.S.C. § 15, Plaintiff seeks to recover treble damages and other relief prayed for below.

## COUNT FIVE

**Horizontal Agreements to Fix Prices**
**Section One of the Sherman Act**

238.    Plaintiff incorporates the above paragraphs as though fully set forth herein.

239.    Defendants' anticompetitive conduct set forth in this Complaint has violated Section One of the Sherman Act. *See* 15 U.S.C. § 1.

240.    Defendants' agreements to fix prices with Methodist Hospital Physician Organization, Dallas Anesthesiology Associates, and the Baylor College of Medicine had the purpose and effect of restraining competition in the Houston and Dallas MSAs for hospital-only anesthesia services.  By entering or maintaining these agreements, USAP was able to profitably maintain prices in the relevant market substantially above what it would have been able to charge absent the agreements.

241.    During the agreements, USAP had, and will continue to have, substantial market power in these relevant markets.

242.    As a result of Defendants' agreements to fix prices, Plaintiff and the Proposed Class have suffered, and will continue to suffer, an antitrust injury because they paid, and will continue to pay, higher prices for hospital-only anesthesia services than they otherwise would have.

243. Defendants' agreement occurred in or had an effect on interstate commerce.

244. Defendants did not engage in these agreements for any pro-competitive purpose. Nor do Defendants' agreements have any pro-competitive effects. The agreements' actual and likely anticompetitive effects outweigh any arguable benefits.

245. Defendants' agreements to fix prices for hospital-only anesthesia services in these relevant markets set forth in this Complaint have violated Section One of the Sherman Act. *See* 15 U.S.C. § 1.

246. Pursuant to Section Four of the Clayton Act, 15 U.S.C. § 15, Plaintiff seeks to recover treble damages and other relief prayed for below.

## COUNT SIX

### Horizontal Agreement to Divide Market
### Section One of the Sherman Act

247. Plaintiff incorporates the above paragraphs as though fully set forth herein.

248. Defendants' anticompetitive conduct set forth in this Complaint has violated Section One of the Sherman Act. *See* 15 U.S.C. § 1.

249. Defendants' agreement with a potential competitor not to enter a market for hospital-only anesthesia services in exchange for consideration had the purpose and effect of restraining competition in that market. Through this

agreement, Defendants profitably maintained prices in the relevant market substantially above what they would have been able to charge absent the agreement.

250.   During the agreement, USAP had, and will continue to have, substantial market power.

251.   As a result of Defendants' agreement to allocate the market, Plaintiff and the Proposed Class suffered, and will continue to suffer, antitrust injury because they paid, and will continue to pay, higher prices for hospital-only anesthesia services than they otherwise would have.

252.   Defendants' agreement occurred in or had an effect on interstate commerce.

253.   Defendants did not engage in this agreement for any pro-competitive purpose.  Nor does Defendants' agreement have any pro-competitive effects.  The agreement's actual and likely anticompetitive effects outweigh any arguable benefits.

254.   Defendants' market allocation agreement set forth in this Complaint violates Section One of the Sherman Act. *See* 15 U.S.C. § 1.

255.   Pursuant to Section Four of the Clayton Act, 15 U.S.C. § 15, Plaintiff seeks to recover treble damages and other relief prayed for below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully prays for the following relief:

A.      An order certifying the action as a class action pursuant to Federal Rule of Civil Procedure 23, and appointing Plaintiff as the representatives of the Class, and appointing his counsel as Class Counsel;

B.      An order declaring that Defendants' acquisitions were an unlawful merger of assets in violation of the federal statutes cited herein;

C.      An order declaring that Defendants' price-setting and market allocation agreements are unlawful restraints of trade, in violation of the federal statutes cited herein;

D.      An injunction enjoining Defendants' transactions and requiring them to divest assets sufficient to restore competition for commercially insured hospital-only anesthesia services in the relevant market to the extent it existed before Defendants' scheme;

E.      Treble damages to members of the Class, for their payments of inflated hospital-only anesthesia services provided by USAP or its co-conspirators;

F.      Equitable relief in the form of restitution or disgorgement of all unlawful or illegal profits received by Defendants as a result of the anticompetitive conduct alleged herein;

82

G.      The costs of bringing this suit, including reasonable attorneys' fees;

H.      An award of pre-and post-judgment interest, to the extent allowable; and

I.       Such other further relief that the Court deems reasonable and just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury.

Dated: January 9, 2025                    Respectfully submitted,

*/s/ Barrett H. Reasoner*
Barrett H. Reasoner (Attorney in Charge)
Federal ID No. 14922
State Bar No. 16641980
Brice Wilkinson
Federal ID No. 1277347
State Bar No. 24075281
**GIBBS & BRUNS LLP**
1100 Louisiana, Suite 5300
Houston, TX  77002
Phone: (713) 751-5244
breasoner@gibbsbruns.com
bwilkinson@gibbsbruns.com

Kellie Lerner (*Pro Hac Vice* forthcoming)
Harrison McAvoy (*Pro Hac Vice* forthcoming)
**SHINDER CANTOR LERNER LLP**
14 Penn Plaza, Fl. 19
New York, NY 10122
Phone: (646) 960-8608
kellie@scl-llp.com
harrison@scl-llp.com

Keagan Potts (*Pro Hac Vice* forthcoming)

83

**SHINDER CANTOR LERNER LLP**
600 14th St NW, 5th Fl.
Washington DC 20005
Phone: (646) 960-8627
kpotts@scl-llp.com

Kimberly A. Justice (*Pro Hac Vice* forthcoming)
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Phone: (224) 632-4500
kjustice@fklmlaw.com

Robert J. Wozniak (*Pro Hac Vice* forthcoming)
**FREED KANNER LONDON & MILLEN LLC**
100 Tri-State International Drive, Suite 128
Lincolnshire, IL 60069
Phone: (224) 632-4500
rwozniak@fklmlaw.com

Justin S. Nematzadeh (*Pro Hac Vice* forthcoming)
**NEMATZADEH PLLC**
101 Avenue of the Americas, Suite 909
New York, NY 10013
Phone: (646) 799-6729
jsn@nematlawyers.com

*Counsel for Plaintiff and the Proposed Class*